# In the United States Court of Federal Claims

No. 17-877C
(Filed: April 17, 2018)

```
*************************************
COMMON GROUND HEALTHCARE      *
COOPERATIVE,                  *
                              *
              Plaintiff,      *        Affordable Care Act; Cost-Sharing
                              *        Reduction Payments; Motion for Class
v.                            *        Certification; RCFC 23
                              *
THE UNITED STATES,            *
                              *
              Defendant.      *
*************************************
```

Stephen Swedlow, Chicago, IL, for plaintiff.

Marc S. Sacks, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff Common Ground Healthcare Cooperative contends, for itself and on behalf of those similarly situated, that the federal government has ceased making the cost-sharing reduction payments to which it and other insurers are entitled under the Patient Protection and Affordable Care Act ("Affordable Care Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and its implementing regulations. Currently before the court are plaintiff's motions, pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC"), to certify a class and for the appointment of class counsel. For the reasons set forth below, the court grants plaintiff's motions.[1]

---

[1] At the conclusion of its response in opposition to plaintiff's motion to certify a cost-sharing reduction class, defendant requests that the court defer ruling on the motion "until there is further clarity regarding the legal and factual issues raised by" plaintiff's cost-sharing reduction claim. The court denies defendant's request.

# I. BACKGROUND

## A. The Affordable Care Act

Congress enacted the Affordable Care Act in March 2010. 124 Stat. at 119. The Act includes "a series of interlocking reforms designed to expand coverage in the individual health insurance market." King v. Burwell, 135 S. Ct. 2480, 2485 (2015). In conjunction with these reforms, the Act provided for the establishment of an American Health Benefit Exchange ("exchange") in each state by January 1, 2014, to facilitate the purchase of "qualified health plans" by individuals and small businesses. 42 U.S.C. §§ 18031, 18041 (2012); accord King, 135 S. Ct. at 2485 (describing an exchange as "a marketplace that allows people to compare and purchase insurance plans"). Qualified health plans can be offered at four levels (bronze, silver, gold, and platinum) that differ based on how much of a plan's benefits an insurer is required to cover under the plan.[2] 42 U.S.C. § 18022(d)(1). An insurer that wants to offer qualified health plans on an exchange is required to offer at least one silver plan and one gold plan. Id. § 18021(a)(1)(C)(ii).

The reforms enacted in the Affordable Care Act provided benefits and risks for insurers. On the one hand, insurers would have access to a market of previously uninsured individuals, which could result in the insurers attracting more customers. See King, 135 S. Ct. at 2485; accord 42 U.S.C. § 18091(2)(C). On the other hand, because insurers lacked data "to predict the needs of the newly-insured" individuals, they would be hampered in their ability to "price [qualified health] plans to reflect the medical costs associated with this new and untested marketplace." Compl. ¶ 2. To mitigate the risk faced by insurers, the Affordable Care Act included three premium stabilization programs, 42 U.S.C. §§ 18061-18063, one of which was the temporary risk corridors program, id. § 18062. Under this three-year program, the Secretary of the Department of Health and Human Services ("Secretary of HHS") was required to make payments to insurers whose costs to provide benefits exceeded the premiums they received (minus administrative costs), and collect payments from insurers whose costs to provide benefits were less than the premiums they received (minus administrative costs). Id. § 18062(a)-(b).

While the risk corridors program was meant to mitigate the risks faced by insurers, two other reforms were aimed at ensuring that individuals had access to affordable insurance coverage and healthcare: the premium tax credit program enacted in section 1401 of the Affordable Care Act, 26 U.S.C. § 36B (2012), and the cost-sharing reduction program enacted in section 1402 of the Affordable Care Act, 42 U.S.C. § 18071.

The premium tax credit is designed to reduce the insurance premiums paid by individuals whose household income is between 100% and 400% of the poverty line. See id. § 18082(c)(2)(B)(i); 26 U.S.C. § 36B(c)(1)(A); accord 26 C.F.R. § 1.36B-2(a) to (b) (2017); 45

---

[2] For example, for a silver-level plan, insurers are required to provide coverage for 70% of the benefits offered under the plan. 42 U.S.C. § 18022(d)(1)(B).

C.F.R. § 156.460(a)(1) (2017).  As set forth in the statute, the Secretary of HHS is required to determine whether individuals enrolling in qualified health plans on an exchange are eligible for the premium tax credit and, if so, to notify the Secretary of the United States Department of the Treasury ("Treasury Secretary") of that fact.  42 U.S.C. § 18082(c)(1).  The Treasury Secretary, in turn, is required to make periodic advance payments of the premium tax credit to the insurers offering the qualified health plans in which the eligible individuals enrolled.  Id. § 18082(c)(2)(A).  The insurers are required to use these advance payments to reduce the premiums of the eligible individuals.  Id. § 18082(c)(2)(B)(i); see also 26 U.S.C. § 36B(f) (describing the process for annually reconciling an individual's actual premium tax credit with the advanced payments of the credit).

Cost-sharing reductions are designed to reduce the out-of-pocket expenses, such as deductibles, copayments, and coinsurance,[3] paid by individuals whose household income is between 100% and 250% of the poverty line.  See 42 U.S.C. §§ 18022(c)(3), 18071(c)(2); accord 45 C.F.R. §§ 155.305(g), 156.410(a).  As set forth in the statute, insurers offering qualified health plans are required to reduce eligible individuals' cost-sharing obligations by specified amounts,[4] 42 U.S.C. § 18071(a), and the Secretary of HHS and/or the Treasury Secretary is required to reimburse the insurers for the cost-sharing reductions they made, id. §§ 18071(c)(3), 18082(c)(3).  The amount of the cost-sharing reduction payments owed to insurers is based on information provided to HHS by the insurers.  See 45 C.F.R. § 156.430(c) (requiring insurers to report to HHS, "for each policy, the total allowed costs for essential health benefits charged for the policy for the benefit year, broken down by . . . (i) [t]he amount the [insurer] paid[,] (ii) [t]he amount the enrollee(s) paid[, and] (iii) [t]he amount the enrollee(s) would have paid under the standard plan without cost-sharing reductions").

In short, "[t]he premium tax credits and the cost-sharing reductions work together:  the tax credits help people obtain insurance, and the cost-sharing reductions help people get treatment once they have insurance."  California v. Trump, 267 F. Supp. 3d 1119, 1123 (N.D. Cal. 2017).

---

[3]  "The term 'cost-sharing' includes . . . deductibles, coinsurance, copayments, or similar charges," but not "premiums, balance billing amounts for non-network providers, or spending for non-covered services."  42 U.S.C. § 18022(c)(3).

[4]  To be eligible for cost-sharing reductions, an individual must enroll in a silver-level plan.  42 U.S.C. § 18071(b)(1).  As noted above, under a standard silver-level plan, insurers are required to provide coverage for 70% of the benefits offered under the plan.  Id. § 18022(d)(1)(B).  However, for eligible individuals, that percentage increases to 73% (when household income is between 200% and 250% of the poverty line), 87% (when household income is between 150% and 200% of the poverty line), or 94% (when household income is between 100% and 150% of the poverty line).  Id. § 18071(c)(2).

**B. Termination of Cost-Sharing Reduction Payments**

Beginning in 2014, the government began making cost-sharing reduction payments to insurers. However, on October 12, 2017, the government terminated the payments based on the Attorney General's conclusion that Congress had not appropriated any funds for that purpose. Because insurers were still required to reduce eligible individuals' cost-sharing obligations, the lack of reimbursement had the potential to cause serious financial strain on the insurers, who might then increase premiums to make up for their lost cost-sharing reduction payments or withdraw from the exchanges to obviate their cost-sharing reduction obligations. Indeed, some insurers did, in fact, increase premiums for the qualified health plans they offered on the exchanges.

**C. Procedural History**

On February 24, 2016, Health Republic Insurance Company ("Health Republic") filed a putative class action in this court in which it alleged that the government had not fully paid the risk corridors payments to which it and other insurers were entitled for 2014 and 2015 ("the Health Republic case"). Subsequently, a number of other insurers filed similar lawsuits, and Health Republic moved to certify its case as a class action. After defendant indicated that it did not dispute that Health Republic had satisfied the requirements of RCFC 23, the court granted Health Republic's motion, certified a class of insurers who were owed risk corridors payments for 2014 and 2015, and appointed the law firm representing Health Republic–Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel")–as class counsel.

Plaintiff, who is represented by the same attorney who represents Health Republic, opted into the certified class in the Health Republic case. Then, on June 27, 2017, plaintiff filed its own putative class action in this court to recover, for itself and other insurers, unpaid risk corridors payments for 2016. Several months later, on November 12, 2017, plaintiff filed an amended complaint to add a claim to recover, for itself and other insurers, the cost-sharing reduction payments that the government has not made since October 2017. Thereafter, several other insurers sought to recover unpaid cost-sharing reduction payments in this court by filing suit or, like plaintiff, adding claims to their existing complaints.[5]

_____

[5] See Local Initiative Health Auth. for L.A. Cty. v. United States, No. 17-1542C (amended complaint filed Feb. 8, 2018); Me. Cmty. Health Options v. United States, No. 17-2057C (filed Dec. 28, 2017); Cmty. Choice Health Options v. United States, No. 18-5C (amended complaint filed Feb. 27, 2018); Sanford Health Plan v. United States, No. 18-136C (filed Jan. 26, 2018); Mont. Health Co-op v. United States, No. 18-143C (filed Jan. 30, 2018); Molina Healthcare of Cal. v. United States, No. 18-333C (filed Mar. 5, 2018); Health Alliance Med. Plans, Inc. v. United States, No. 18-334C (filed Mar. 5, 2018); Blue Cross & Blue Shield of Vt. v. United States, No. 18-373C (filed Mar. 9, 2018).

On December 14, 2017, plaintiff moved to certify two classes–a risk corridors class and a cost-sharing reduction class–and for the appointment of Quinn Emanuel as class counsel. Defendant responded shortly thereafter, indicating that it did not dispute that plaintiff had satisfied the requirements of RCFC 23 with respect to the risk corridors class and that it did not oppose plaintiff's motion for the appointment of class counsel with respect to either class.  After receiving defendant's response, the court granted plaintiff's motion to certify a risk corridors class, certified a class of insurers who were owed risk corridors payments for 2016, and appointed Quinn Emanuel as class counsel.

Defendant subsequently filed a response in opposition to plaintiff's motion to certify a cost-sharing reduction class, and plaintiff filed a reply in support of its motion.  The court deems oral argument unnecessary.

## II.  DISCUSSION

In its class certification motion, plaintiff seeks the certification of a cost-sharing reduction class, which it describes as follows:

> All persons or entities offering Qualified Health Plans under the Patient Protection and Affordable Care Act in the 2017 or 2018 benefit year, and who made cost-sharing reductions for eligible insureds pursuant to Section 1402 of the Patient Protection and Affordable Care Act, but did not receive a "timely and periodic" payment from the Government of an amount "equal to the value of the reductions" provided to its insureds.  Excluded from the Class is the Defendant and its members, agencies, divisions, departments, and employees.

Mot. 2.

### A.  Legal Standard

RCFC 23 governs the certification and conduct of class actions in the United States Court of Federal Claims ("Court of Federal Claims").  Among other provisions, it includes several requirements for maintaining a class action:

> (a)  Prerequisites.  One or more members of a class may sue as representative parties on behalf of all members only if:
>
> (1)  the class is so numerous that joinder of all members is impracticable;
>
> (2)  there are questions of law or fact common to the class;
>
> (3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

(b)  Class Actions Maintainable.  A class action may be maintained if RCFC 23(a) is satisfied and if:

(1)  [not used];

(2)  the United States has acted or refused to act on grounds generally applicable to the class; and

(3)  the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

(A)  the class members' interests in individually controlling the prosecution of separate actions;

(B)  the extent and nature of any litigation concerning the controversy already begun by class members;

(C)  [not used]; and

(D)  the likely difficulties in managing a class action.

RCFC 23(a)-(b) (alterations in original).  In other words, a putative class representative must demonstrate:  (i) numerosity–that the proposed class is so large that joinder is impracticable; (ii) commonality–that there are common questions of law or fact that predominate over questions affecting individual prospective class members and that the government has treated the prospective class members similarly; (iii) typicality–that its claims are typical of the proposed class; (iv) adequacy–that it will fairly represent the proposed class; and (v) superiority–that a class action is the fairest and most efficient method of resolving the suit.  Toscano v. United States, 98 Fed. Cl. 152, 155 (2011); Barnes v. United States, 68 Fed. Cl. 492, 494 (2005).  The class action's proponent must satisfy each of the requirements by a preponderance of the evidence.  Messner v. Northshore Univ. HealthSys., 669 F.3d 802, 811 (7th Cir. 2012) (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)); see also Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  Moreover, "[t]hese requirements are in the conjunctive; hence, a failure to satisfy any one of them is fatal to class certification."  Barnes, 68 Fed. Cl. at 494.  The court may certify a class only if, "after a rigorous

analysis," it finds that the requirements of RCFC 23 have been met.  Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982).

Although defendant's sole argument in opposition to plaintiff's motion to certify a cost-sharing reduction class is that plaintiff has not met its burden of establishing that a class action is superior to other methods of resolving insurers' claims for unpaid cost-sharing reduction payments, the court addresses all of the factors that plaintiff must satisfy.

## B.  Numerosity

To prevail on its motion to certify a cost-sharing reduction class, plaintiff must first satisfy the numerosity requirement.  RCFC 23(a)(1) specifies that a class action is appropriate only if "the class is so numerous that joinder of all members is impracticable[.]"  "'Impracticable does not mean impossible.'"  Jaynes v. United States, 69 Fed. Cl. 450, 454 (2006) (quoting Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)); see also Fauvergue v. United States, 86 Fed. Cl. 82, 96 (2009) ("The ability to use joinder does not preclude certification."), rev'd on other grounds sub nom. Bright v. United States, 603 F.3d 1273 (Fed. Cir. 2010).  Rather, a putative class representative need only establish that "'it is extremely difficult or inconvenient to join all the members of the class.'"  Jaynes, 69 Fed. Cl. at 454 (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2005) ("Wright 2005")).  A court must examine the facts of the case to determine whether the numerosity requirement has been satisfied.  Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980).  In particular, a court should consider the number of potential class members, the geographic dispersal of the potential class members, and the size of each potential class member's claim.  King v. United States, 84 Fed. Cl. 120, 123-24 (2008); accord Jaynes, 69 Fed. Cl. at 454; 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.22[1][b] (3d ed. 2012); 7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2016).

The number of potential class members is considered to be the most important factor of the numerosity requirement.  King, 84 Fed. Cl. at 124; Fauvergue, 86 Fed. Cl. at 96.  Plaintiff represents, based on the number of insurers offering qualified health plans on the exchanges, that hundreds of such insurers are owed cost-sharing reduction payments.  This fact, standing alone, is sufficient to satisfy the numerosity requirement.  See, e.g., Brown v. United States, 126 Fed. Cl. 571, 578 n.3 (2016) (indicating that the Court of Federal Claims has found potential class sizes of 23, 25, 135, 150, and 152 members sufficient to satisfy the numerosity requirement).  Indeed, in the risk corridors context, the court certified a class in the Health Republic case that ultimately included 149 members, and certified a class in this case with the knowledge that there were approximately 280 potential class members.  Moreover, plaintiff observes that potential class members are dispersed throughout the country–a fact that supports the conclusion that

plaintiff has satisfied the numerosity requirement.[6]  See, e.g., King, 84 Fed. Cl. at 124-25 ("If plaintiffs are dispersed geographically, then a court is more likely to certify a class action.").

## C. Commonality

The next requirement, commonality, comprises three separate inquiries.  First, are there factual or legal issues common to the proposed class?  RCFC 23(a)(2).  Second, do these common issues predominate over issues that are not common to the proposed class?  RCFC 23(b)(3).  And third, has the government acted or refused to act on grounds applicable to the entire proposed class?  RCFC 23(b)(2).  In analyzing whether the commonality requirement has been satisfied, "the court must, where necessary, look beyond the pleadings, and seek to develop an understanding of the relevant claims, defenses, facts and substantive law." Barnes, 68 Fed. Cl. at 494; accord Wal-Mart Stores, Inc., 564 U.S. at 350-52.  As discussed below, plaintiff has established all three elements of the commonality requirement.

### 1. Common Issues

First, to establish the existence of a common factual or legal issue, plaintiff must demonstrate that the claims of the potential class members "depend upon a common contention" that "is capable of classwide resolution[.]"  Wal-Mart Stores, Inc., 564 U.S. at 350; see also King, 84 Fed. Cl. at 126 (agreeing that "'commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members'" (quoting Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001))); Barnes, 68 Fed. Cl. at 496 ("[T]he questions underlying the claims of the class merely must share essential characteristics, so that their resolution will advance the overall case.").  A common contention can be resolved for the entire class if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, Inc., 564 U.S. at 350; accord id. ("'What matters to class certification . . . is not the raising of common "questions"–even in droves–but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009))); Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) ("[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50, at 196-97 (5th ed. 2012)).  Only one significant common contention capable of classwide resolution is necessary to satisfy the common-issue requirement.  See Barnes, 68 Fed. Cl. at 496 n.6.

---

[6]  Plaintiff also contends that some of the potential cost-sharing reduction claims are small enough that insurers might not pursue them in the absence of a class action, but does not supply any evidence supporting this contention.

Plaintiff identifies five issues that are common to all potential members of the proposed cost-sharing reduction class, including whether the pertinent statute and regulation mandate the payment of money, whether the government's failure to make periodic cost-sharing reduction payments violates the pertinent statute and regulation, and whether the government is liable to the potential class members for its failure to make the payments.[7]  These issues are, in fact, common to all potential class members.  Thus, plaintiff has satisfied the common-issue requirement.

## 2. Predominance

In addition to determining whether plaintiff has established the existence of common factual or legal issues, the court must determine whether those issues predominate over issues that are not common to the proposed class.  This predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "is far more demanding" than the initial common-issue inquiry.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997); accord Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013).  Common issues–those in which the same evidence could be used by each member of the class to make a prima facie showing–predominate over individual issues–those in which each member of the class must present individualized evidence to make a prima facie showing–if they "'are more substantial than the issues subject only to individualized proof.'"  Jaynes, 69 Fed. Cl. at 457 (quoting Moore v. PayneWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)); accord Tyson Foods, Inc., 136 S. Ct. at 1045; Geneva Rock Prods., Inc. v. United States, 100 Fed. Cl. 778, 789 (2011).

As plaintiff observes, all potential members of the proposed cost-sharing reduction class

> are subject to the same statutory and regulatory regime under the [cost-sharing reduction] provision of the [Affordable Care Act]–the same requirements to be [qualified health plan] issuers, the same obligations to provide [Affordable Care Act]-compliant plans, the same reporting requirements, and the same requirements to provide cost-sharing reduction to insureds while being denied [cost-sharing reduction] reimbursements by the Government.

Mot. 23.  The only issue that is not common to the proposed class is the precise amount of money allegedly due to each potential class member under the pertinent statutes and regulations.

---

[7] Another common issue not mentioned by plaintiff, but implicated in defendant's response in opposition to plaintiff's motion, is whether the government's liability for its failure to make cost-sharing reduction payments is mitigated by the increased premium tax credits it paid to insurers after it ceased making cost-sharing reduction payments.  This issue is discussed in more detail below.  See infra Sections II.C.2, II.F.

In its response in opposition to plaintiff's motion, defendant suggests–as part of its argument concerning the superiority factor–that the need to calculate damages for each potential class member overwhelms the common issues, rendering class certification inappropriate. Specifically, it argues:

> [Plaintiff's cost-sharing reduction claims] may present individualized questions . . . , because many insurers will not have been injured because their [cost-sharing reduction] liabilities will have been offset by premiums that were raised in connection with the cessation of [cost-sharing reduction] payments, resulting in increased premium tax credit payments from the government.  The class action mechanism would make adjudicating these individualized questions impracticable.

Resp. 12 (citation omitted).  However, as plaintiff remarks, defendant does not identify any statutory provision permitting the government to use premium tax credit payments to offset its cost-sharing reduction payment obligations (even if insurers intentionally increased premiums to obtain larger premium tax credit payments to make up for lost cost-sharing reduction payments).[8] In the absence of such an offset, the calculation of each potential class member's unpaid cost-sharing reduction payments appears to be a rather straightforward process based on data provided to the government by the insurers–the identity of each qualified health plan in which individuals eligible for cost-sharing reductions are enrolled, and the amount of each individual's cost-sharing reduction.  Such a calculation lacks the complexity that would overwhelm the issues common to the proposed class.  Furthermore, it is well settled that the need for individualized damages calculations does not preclude the certification of a class.  See, e.g., Geneva Rock Prods., Inc., 100 Fed. Cl. at 789 ("The central legal questions of this case . . . can all be resolved through generalized proof.  Even though the question of just compensation will require 'individualized proof' if the government is found liable, this court has repeatedly held that the overall question of liability is 'more substantial' than the individualized calculation of damages."); Haggart v. United States, 89 Fed. Cl. 523, 533-34 (2009) ("The primary factual difference among potential class members concerns the damages each individual class member would be entitled to receive if the court found the government's actions constituted a taking of plaintiffs' property. . . . However, . . . differences in the amount of potential damages among putative class members will not alone prevent class certification."); Fauvergue, 86 Fed. Cl. at 100 ("The predominate question applicable to all putative plaintiffs is whether the Government committed a taking . . . .

---

[8]  Rather, defendant suggests that the October 2017 decision of the United States District Court for the Northern District of California ("district court") in California v. Trump supports the availability of such an offset.  See Resp. 10 ("As [the district court] noted, many insurers have been able to recoup [cost-sharing reduction] payments for 2018 by raising premiums to account for the non-payment of [cost-sharing reductions] and those higher premium costs are then paid for by the Government through increased premium tax credits."); accord id. at 12.  As the court explains below in its discussion of the superiority factor, defendant's reliance on this decision is misplaced.  See infra Section II.F.

That plaintiffs may receive different awards of damages based on the nature of the takings claim does not displace the principal legal question or the core facts of this case."); Curry v. United States, 81 Fed. Cl. 328, 334 (2008) ("The '[m]ere fact that damage awards will ultimately require individualized fact determinations is insufficient, by itself' to defeat a class action." (quoting McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984))).  In sum, plaintiff has established that the common issues presented in this case predominate over the sole individualized issue.

### 3. Similar Treatment

The final aspect of the commonality requirement is determining whether the government has "acted or refused to act on grounds generally applicable to the class." RCFC 23(b)(2). Plaintiff contends that the government's failure to make cost-sharing reduction payments to insurers satisfies this requirement. There can be no dispute that this failure to act is generally applicable to the class. Thus, plaintiff has established this aspect of the commonality requirement.

### D. Typicality

The third general requirement for maintaining a class action is that the claims of the proposed class representative(s) be typical of the claims of the other prospective class members. See RCFC 23(a)(3).  In many ways, the typicality requirement is similar to the commonality requirement:  "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Gen. Tel. Co. of the Sw., 457 U.S. at 157 n.13. Nevertheless, typicality and commonality are distinct requirements.  Typicality is demonstrated "when 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Barnes, 68 Fed. Cl. at 498 (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)).  It "may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class, provided that the named representatives' claims share the same essential characteristics as the claims of the class at large." Fisher v. United States, 69 Fed. Cl. 193, 200 (2006) (citing Piazza v. EBSCO Indus., Inc., 273 F.3d 1341, 1351 (11th Cir. 2001)).  Accordingly, "[t]he threshold requirement for typicality is . . . not high." Id.

Plaintiff argues that it satisfies the typicality requirement because, in its role as the representative party, it is alleging the same government conduct, stating the same claim, and seeking the same relief as all potential members of the proposed cost-sharing reduction class. The court agrees.

### E. Adequacy

In addition to establishing numerosity, commonality, and typicality, a putative class representative must establish that it will "fairly and adequately protect the interests of the class." RCFC 23(a)(4).  There are two aspects to the adequacy requirement:  the existence of conflicts between the putative class representative and the members of the proposed class, and the qualifications and capabilities of proposed class counsel.  Amchem Prods., Inc., 521 U.S. at 625-26 & n.20; Gen. Tel. Co. of the Sw., 457 U.S. at 157 n.13.

### 1. Conflicts of Interest

The first component of the adequacy requirement concerns whether there are any conflicts of interest precluding a plaintiff from serving as a class representative.  See Gen. Tel. Co. of the Nw., Inc., 446 U.S. at 331.  Plaintiff contends that "[t]here are no 'conflicting, competing, or antagonistic interests as between [it] and the proposed class' that would warrant a finding that [it] would not adequately protect the class's interest."  Mot. 26-27 (quoting Singleton v. United States, 92 Fed. Cl. 78, 86 (2010)).  Indeed, the court cannot discern any conflicts of interest, especially given the almost universal commonality of the issues requiring the court's resolution.  Thus, plaintiff has established this component of the adequacy requirement.

### 2. Proposed Class Counsel

The second component of the adequacy requirement concerns the experience and competence of proposed class counsel.  Before the court can appoint class counsel, it "must consider":

> (i)  the work counsel has done in identifying or investigating potential claims in the action;

> (ii)  counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> (iii)  counsel's knowledge of the applicable law; and

> (iv)  the resources that counsel will commit to representing the class[.]

RCFC 23(g)(1)(A).  In addition, it "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]"  RCFC 23(g)(1)(B).  Ultimately, the court must satisfy itself that the proposed class counsel would best serve the interests of the proposed class.  RCFC 23(g)(2).

Plaintiff seeks the appointment of Quinn Emanuel as counsel for the cost-sharing reduction class.  The court finds that Quinn Emanuel has the experience and resources necessary

to handle class actions, as reflected by its prior decision to appoint Quinn Emanuel as class counsel for the two risk corridors classes.  Further, as reflected by plaintiff's amended complaint and motion for class certification, Quinn Emanuel has performed the work necessary to identify and investigate the potential cost-sharing reduction claims, and is well versed in the law regarding such claims.  Accordingly, the court finds that plaintiff has satisfied the second component of the adequacy requirement.

## F.  Superiority

The final requirement that plaintiff must satisfy to maintain a class action is superiority; in other words, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."[9]  RCFC 23(b)(3).  This requirement is met if the prospective class representative establishes that "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment, quoted in Amchem Prods., Inc., 521 U.S. at 615.  Among the factors to consider in determining superiority are (1) the potential "class members' interests in individually controlling the prosecution of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by class members," and (3) "the likely difficulties in managing a class action."  RCFC 23(b)(3).  "Essentially, under this prong of the analysis, the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action."  Barnes, 68 Fed. Cl. at 499; see also Jaynes, 69 Fed. Cl. at 459 ("In making [the superiority] assessment, the court must consider what alternative procedures are available for disposing of the dispute and compare the possible alternatives to determine whether Rule 23 will be sufficiently effective to justify the class action approach.  The superiority requirement is most clearly satisfied 'if a comparative evaluation of other procedures reveals no other realistic possibilities.'" (citation omitted) (quoting 7AA Wright 2005, supra, § 1779)).

Plaintiff asserts that a class action is "superior to joinder or individual adjudication of" cost-sharing reduction claims, explaining that "[a] single Government action affected" each potential member of the proposed cost-sharing reduction class "in exactly the same way," and that the government can identify each potential class member and possesses, or will soon possess, "the data showing how much it owes each" potential class member.  Mot. 27-28.  Consequently, plaintiff argues, resolution of the legal issues presented in this case on a classwide basis would achieve economies of time, effort, and expense.  Plaintiff further contends that it has

---

[9]  There are several other methods of adjudicating the claims of multiple individuals arising from the same course of conduct:  the permissive joinder of parties under RCFC 20, the filing of a related case under RCFC 40.2, and consolidation under RCFC 42(a).  Procedurally, RCFC 20 requires a motion to amend the complaint to join new plaintiffs, while RCFC 40.2 and RCFC 42(a) require the filing of separate complaints.

satisfied the factors described in RCFC 23(b)(3) because (1) "[t]here is nothing to indicate that a Class member would benefit from individually controlling an action, and because the Court of Federal Claims permits only opt-in classes, there is no concern that a class member might be swallowed into a class that it would prefer not to participate in," and (2) "there are no 'likely difficulties,' in managing the class." Id. at 28 (citations omitted).

In response, defendant argues that plaintiff has not met its burden of establishing that a class action would be the superior method of resolving insurers' cost-sharing reduction claims. In particular, defendant contends that plaintiff has not demonstrated that the consolidation of separate suits pursuant to RCFC 42 "is a less effective mechanism for considering" the claims.[10] Resp. 10. Defendant avers that "Rule 42's consolidation procedures are superior to a class action because those procedures will allow the Court to consider the common issues shared by the plaintiffs, while also allowing the Court to assess whether the cessation of [cost-sharing reduction] payments operated to an individual plaintiff's detriment in a particular case." Id. According to defendant, there will be significant individualized determinations in resolving insurers' cost-sharing reduction claims "because many insurers will not have been injured because their [cost-sharing reduction] liabilities will have been offset by premiums that were raised in connection with the cessation of [cost-sharing reduction] payments, resulting in increased premium tax credit payments from the government." Id. at 12.

---

[10] RCFC 42 provides:

(a) Consolidation.  If actions before the court involve a common question of law or fact, the court may:

   (1) join for hearing or trial any or all matters at issue in the actions;

   (2) consolidate the actions; or

   (3) issue any other orders to avoid unnecessary cost or delay.

(b) Separate Trials.  For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, counterclaims, or third-party claims.

(c) Separate Determinations of Liability and Damages.

   (1) In General.  On stipulation of the parties or on its own, the court may at any time order that issues of liability and issues of damages be addressed in separate proceedings.

   (2) Motion for Reconsideration.  The parties may file a motion for reconsideration within 14 days after a separate determination of liability.

-14-

As noted above, defendant does not identify any statutory provision permitting the government to use premium tax credit payments to offset its cost-sharing reduction payment obligations (even if insurers intentionally increased premiums to obtain larger premium tax credit payments to make up for lost cost-sharing reduction payments).  Rather, defendant suggests that the district court's decision in California v. Trump supports the availability of such an offset.  Defendant's reliance on that decision for this proposition is misplaced.  Although the district court described how insurers are coping with the lost cost-sharing reduction payments by raising premiums to obtain larger premium tax credit payments, nowhere in its decision does the district court hold that the government's liability for cost-sharing reduction payments is lessened or eliminated by the government making larger premium tax credit payments to insurers.  Indeed, the district court very clearly emphasized that the premium tax credit program and cost-sharing reduction program were separate and distinct:

> Repeatedly referring to the two programs by their separate names suggests Congress considered them distinct, if undoubtedly related.  And the statute often recites not just the names of these two programs, but the different statutory provisions that created them.  For instance, in the advance payment provision, . . . the statute refers to "the premium tax credit allowable under section 36B of Title 26 and the cost-sharing reductions under section 18071 of this title."  42 U.S.C. § 18082(a)(1); see also, e.g., id. § 300gg-4(l)(3)(A)(ii) ("credits under section 36B of Title 26 or cost-sharing assistance under section 18071 of this title"); id. § 18031(i)(3)(B) ("premium tax credits under section 36B of Title 26 and cost-sharing reductions under section 18071 of this title").  That Congress so often identified each reform by its location in one title of the U.S. Code or the other suggests that Congress was cognizant of the different way in which each reform fit into the statutory scheme.

California, 267 F. Supp. 3d at 1131.  Moreover, the portion of the decision upon which defendant relies–pages 1133 to 1139–contains the district court's analysis of "whether the absence of a preliminary injunction would harm the public and impede the objectives of health care reform." Id. at 1133.  In other words, the district court's focus was on how the increase in premiums would affect the public, and not on the government's obligation to make payments to insurers.

The court recognizes that the parties have not had the opportunity to fully brief the issue of whether the government's obligation to make cost-sharing reduction payments is mitigated by its increased premium tax credit payments–an issue that is common to all potential class members.  However, given the lack of cited authority supporting the availability of such an offset, the determination of the amount due to each potential class member appears to consist of a straightforward calculation based on data that the government has obtained, or will be obtaining, from the affected insurers.  Thus, for the purposes of resolving the present motion, the court must assume that the individual damages determinations will be uncomplicated.

As plaintiff observes in its reply in support of its motion, defendant does not argue that insurers "have strong interests in litigating their own separate actions" or that "numerous individual class members have filed their own lawsuits regarding [cost-sharing reduction] payments."  Reply 5.  Instead, defendant addresses the manageability of the proposed class action, arguing that the need for individualized damages determinations makes consolidation more appropriate than a class action.  Plaintiff convincingly rebuts this argument.

First, plaintiff reiterates the position it advanced in its motion that resolution of the legal issues presented in this case on a classwide basis would achieve economies of time, effort, and expense because each insurer was affected by the same government action in the same way.  The court agrees.  A class action would allow insurers to pursue their cost-sharing reduction claims without the need to file separate complaints–an efficient and cost-effective approach.  Further, a class action would relieve both defendant and the court of the burdens associated with managing potentially hundreds of new cases with virtually identical allegations.

Second, plaintiff rightly observes that consolidation would not be more efficient than a class action, explaining:

> In essence, the Government argues that [qualified health plan] issuers should be forced to hire separate lawyers, spend time and money drafting their own complaints, pay filing and other related fees, generate a new index number with each case, and then either file a motion to consolidate their individual action with this case or force the Government to file its own motion requesting that relief.  All of this, according to the Government, will be more efficient, fair, and thus "superior" to a class action in which putative class members simply fill in a form to opt into a class with counsel who has been at the forefront of this litigation for over two years.

Id. at 6-7.  There can be no question that the consolidation of cost-sharing reduction claims would be more cumbersome than allowing insurers to pursue their claims in a class action.

In sum, the court finds that plaintiff has satisfied its burden of establishing that a class action is superior to other methods of resolving insurers' cost-sharing reduction claims.

## III. CONCLUSION

Because plaintiff has satisfied all of the requirements set forth in RCFC 23 for maintaining a class action, the court **GRANTS** plaintiff's motion to certify a cost-sharing reduction class.  Specifically:

1.  The court certifies the following cost-sharing reduction class:

All persons or entities offering Qualified Health Plans under the Patient Protection and Affordable Care Act in the 2017 or 2018 benefit year, and who made cost-sharing reductions for eligible insureds pursuant to Section 1402 of the Patient Protection and Affordable Care Act, but did not receive a "timely and periodic" payment from the Government of an amount "equal to the value of the reductions" provided to its insureds.  Excluded from the Class is the Defendant and its members, agencies, divisions, departments, and employees.

2.  The cost-sharing reduction class claim is for amounts allegedly owed to the class by the United States pursuant to section 1402 of the Affordable Care Act (42 U.S.C. § 18071) and 45 C.F.R. § 156.430 for the 2017 and 2018 benefit years.

3.  The parties may later move for decertification or move for the class to be divided into subclasses if, as this case develops, the circumstances warrant such a motion.

4.  Plaintiff is designated as the class representative.

5.  The court **GRANTS** the unresolved portion of plaintiff's motion for the appointment of class counsel and appoints Quinn Emanuel as counsel for the cost-sharing reduction class.[11]

6.  Defendant, by **no later than Friday, May 18, 2018**, shall provide to plaintiff a list of potential class members, which shall include all entities that offered qualified health plans under the Affordable Care Act in the 2017 and 2018 benefit years, and who made cost-sharing reductions for eligible insureds pursuant to section 1402 of the Affordable Care Act, but did not receive a "timely and periodic" payment from the government of an amount "equal to the value of the reductions" provided to its insureds.  The list shall include the name of the individual or entity that is a potential class member, the current or last known electronic-mail address of the individual or entity (providing the name and electronic-mail address of the person responsible for cost-sharing reduction receivables, if known), and the current or last known mailing address of the individual or entity.

7.  If, after May 18, 2018, plaintiff discovers the identity of additional potential class members to whom plaintiff believes that notice should be provided, plaintiff shall promptly inform defendant.  Defendant shall have an opportunity to object to any additional potential class members **within seven calendar days** from the date that plaintiff identifies the newly discovered potential class members by forwarding its objections to plaintiff via electronic mail.  If the parties

---

[11]  Notwithstanding the appointment of Quinn Emanuel as class counsel, all filings made on behalf of the class shall continue to be signed by the attorney of record for the class representative.  See RCFC 83.1(c)(1)-(2) ("A party may have only one attorney of record in a case at any one time . . . .  All filings must be signed in the attorney of record's name.").

are unable to resolve any of defendant's objections to the newly discovered potential class members, they shall file a joint motion setting out in separate sections their respective positions for resolution by the court.

8.  Class counsel shall submit to the court a proposed notice plan and opt-in schedule that complies with the requirements of RCFC 23(c)(2)(B) by **no later than Wednesday, May 30, 2018**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge