# In the United States Court of Federal Claims

No. 17-877C
(Filed: February 15, 2019)

```
*****************************************
COMMON GROUND HEALTHCARE      *
COOPERATIVE,                  *
                              *
          Plaintiff,          *   Affordable Care Act; Cost-Sharing
                              *   Reduction Payments; 42 U.S.C. § 18071;
v.                            *   Motion for Summary Judgment, RCFC 56;
                              *   Motion to Dismiss, RCFC 12(b)(6)
THE UNITED STATES,            *
                              *
          Defendant.          *
*****************************************
```

Stephen Swedlow, Chicago, IL, for plaintiff.

Christopher J. Carney, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Chief Judge

      Plaintiff Common Ground Healthcare Cooperative contends, for itself and on behalf of those similarly situated, that the federal government ceased making the cost-sharing reduction payments to which it and other insurers are entitled under the Patient Protection and Affordable Care Act ("Affordable Care Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and its implementing regulations. Currently before the court are plaintiff's motion for summary judgment and defendant's cross-motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons set forth below, the court finds that plaintiff is entitled to recover the unpaid cost-sharing reduction reimbursements. Therefore, it grants plaintiff's motion and denies defendant's motion.

## I. BACKGROUND

### A. The Affordable Care Act

Congress enacted the Affordable Care Act as part of a comprehensive scheme of health insurance reform.[1]  See generally King v. Burwell, 135 S. Ct. 2480 (2015).  Specifically, the Act includes "a series of interlocking reforms designed to expand coverage in the individual health insurance market."  Id. at 2485.  In conjunction with these reforms, the Act provided for the establishment of an American Health Benefit Exchange ("exchange") in each state by January 1, 2014, to facilitate the purchase of "qualified health plans" by individuals and small businesses.  42 U.S.C. §§ 18031, 18041 (2012); accord King, 135 S. Ct. at 2485 (describing an exchange as "a marketplace that allows people to compare and purchase insurance plans").  Qualified health plans can be offered at four levels (bronze, silver, gold, and platinum) that differ based on how much of a plan's benefits an insurer must cover under the plan.[2]  42 U.S.C. § 18022(d)(1).

Among the reforms included in the Affordable Care Act were two aimed at ensuring that individuals have access to affordable insurance coverage and health care:  the premium tax credit enacted in section 1401 of the Act, 26 U.S.C. § 36B (2012), and the cost-sharing reduction program enacted in section 1402 of the Act, 42 U.S.C. § 18071.  "The premium tax credits and the cost-sharing reductions work together:  the tax credits help people obtain insurance, and the cost-sharing reductions help people get treatment once they have insurance."  California v. Trump, 267 F. Supp. 3d 1119, 1123 (N.D. Cal. 2017).

### 1. Premium Tax Credit

The first of these two reforms, the premium tax credit, is designed to reduce the insurance premiums paid by individuals whose household income is between 100% and 400% of the poverty line.  See 26 U.S.C. § 36B(c)(1)(A); 42 U.S.C. § 18082(c)(2)(B)(i); accord 26 C.F.R. § 1.36B-2(a) to (b) (2017); 45 C.F.R. § 156.460(a)(1) (2017).  The Secretary of the Department of Health and Human Services ("Secretary of HHS") is required to determine whether individuals enrolling in qualified health plans on an exchange are eligible for the premium tax credit and, if so, to notify the Secretary of the United States Department of the Treasury ("Treasury Secretary") of that fact.  42 U.S.C. § 18082(c)(1).  The Treasury Secretary, in turn, is required to make periodic advance payments of the premium tax credit to the insurers offering the qualified health plans in which the eligible individuals enrolled.  Id. § 18082(c)(2)(A).  The insurers are required to use these advance payments to reduce the premiums of the eligible individuals.  Id. § 18082(c)(2)(B)(i); see also 26 U.S.C. § 36B(f) (describing the process for

---

[1] Seven days after enacting the Affordable Care Act, Congress enacted the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, which included additional provisions related to health insurance reform.

[2] For example, for a silver-level qualified health plan, insurers are required to provide coverage for 70% of the benefits offered under the plan.  42 U.S.C. § 18022(d)(1)(B).  Insurers offering qualified health plans on an exchange must offer at least one silver-level plan and one gold-level plan.  Id. § 18021(a)(1)(C)(ii).

annually reconciling an individual's actual premium tax credit with the advance payments of the credit). To fund the premium tax credit, Congress amended a preexisting permanent appropriation to allow for the payment of refunds arising from the credit. See 31 U.S.C. § 1324 (2012) ("Necessary amounts are appropriated . . . for refunding internal revenue collections as provided by law . . . . Disbursements may be made from the appropriation made by this section only for . . . refunds due from credit provisions of [26 U.S.C. § 36B].").

### 2. Cost-Sharing Reductions

The other reform, cost-sharing reductions, is designed to reduce the out-of-pocket expenses (such as deductibles, copayments, and coinsurance[3]) paid by individuals whose household income is between 100% and 250% of the poverty line. See 42 U.S.C. §§ 18022(c)(3), 18071(c)(2); accord 45 C.F.R. §§ 155.305(g), 156.410(a). Insurers offering qualified health plans are required to reduce eligible individuals' cost-sharing obligations by specified amounts,[4] 42 U.S.C. § 18071(a), and the Secretary of HHS is required to reimburse the insurers for the cost-sharing reductions they make, see id. § 18071(c)(3)(A) ("[T]he Secretary [of HHS] shall make periodic and timely payments to the issuer equal to the value of the reductions.").

The Secretary of HHS is afforded some discretion in the timing of the reimbursements: once he determines which individuals are eligible for cost-sharing reductions, he must notify the Treasury Secretary "if an advance payment of the cost-sharing reductions . . . is to be made to the issuer of any qualified health plan" and, if so, the time and amount of such advance payment. Id. § 18082(c)(3). Pursuant to this authority, the Secretary of HHS established a reimbursement schedule by which the government "would make monthly advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts." Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,486 (Mar. 11, 2013) (to be codified at 45 C.F.R. § 156.430); see also 45 C.F.R. § 156.430(b)(1) ("A [qualified health plan] issuer will receive periodic advance payments [for cost sharing reductions]."). The amount of the cost-sharing reduction payments owed to insurers is based on information provided to HHS by the insurers. See 45 C.F.R. § 156.430(c) (requiring insurers to report to HHS, "for each policy, the total allowed costs for essential health benefits charged for the policy for the benefit year, broken down by . . . (i) [t]he amount the [insurer]

---

[3] "The term 'cost-sharing' includes . . . deductibles, coinsurance, copayments, or similar charges," but not "premiums, balance billing amounts for non-network providers, or spending for non-covered services." 42 U.S.C. § 18022(c)(3).

[4] To be eligible for cost-sharing reductions, an individual must enroll in a silver-level qualified health plan. 42 U.S.C. § 18071(b)(1). Under a standard silver-level plan, insurers are required to provide coverage for 70% of the benefits offered under the plan. Id. § 18022(d)(1)(B). However, for eligible individuals, that percentage increases to 73% (when household income is between 200% and 250% of the poverty line), 87% (when household income is between 150% and 200% of the poverty line), or 94% (when household income is between 100% and 150% of the poverty line). Id. § 18071(c)(2).

paid[,] (ii) [t]he amount the enrollee(s) paid[, and] (iii) [t]he amount the enrollee(s) would have paid under the standard plan without cost-sharing reductions").

The Affordable Care Act did not include any language appropriating funds to make the cost-sharing reduction payments.

### 3. Requirements for Insurers

To offer a health insurance plan on an exchange in any given year—and become eligible to receive payments for the premium tax credit and cost-sharing reductions—an insurer must satisfy certain requirements established by the Secretary of HHS. See, e.g., 42 U.S.C. § 18041(a)(1) (authorizing the Secretary of HHS to "issue regulations setting standards for meeting the requirements under [title I of the Affordable Care Act] with respect to—(A) the establishment and operation of Exchanges . . . ; (B) the offering of qualified health plans through such Exchanges; . . . and (D) such other requirements as the Secretary determines appropriate"). The requirements include (1) obtaining certification that any plan it intends to offer is a qualified health plan, see, e.g., 45 C.F.R. §§ 155.1000, .1010, 156.200; and (2) submitting rate and benefit information before the open enrollment period for the applicable year, see, e.g., id. §§ 155.1020, 156.210. In addition, in most circumstances, insurers must make their qualified health plans available on the exchanges for the entire year for which the plans were certified. 45 C.F.R. § 156.272(a).

### B. Termination of Cost-Sharing Reduction Payments

On April 10, 2013, before the exchanges opened for business, President Barack H. Obama submitted to Congress his budget for fiscal year 2014. See Office of Mgmt. & Budget, Exec. Office of the President, Fiscal Year 2014 Budget of the United States Government to Congress (2013). The budget included a request for a line-item appropriation for cost-sharing reduction payments. See id. at App. 448; accord Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Fiscal Year 2014 Justification of Estimates for Appropriations Committees 184 (2013). However, Congress did not provide the requested appropriation. See Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5; see also S. Rep. No. 113-71, at 123 (2013) ("The Committee recommendation does not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the [Affordable Care Act]."). In fact, it is undisputed by the parties that Congress has never specifically appropriated funds to reimburse insurers for their cost-sharing reductions.[5] It is further undisputed that Congress has never (1) expressly prevented—in an appropriations act or otherwise—the Secretary of HHS or the Treasury Secretary from expending funds to make cost-sharing reduction payments or (2) amended the Affordable Care Act to eliminate the cost-sharing reduction payment obligation.

---

[5] Whether Congress will appropriate funds for cost-sharing reduction payments in the future is an open question. Cf. Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2020, 84 Fed. Reg. 227, 283 (Jan. 24, 2019) ("The Administration supports a legislative solution that would appropriate [cost-sharing reduction] payments . . . .").

Although Congress did not specifically appropriate funds for cost-sharing reduction payments, the Obama administration began making advance payments to insurers for cost-sharing reductions in January 2014. See Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Guidance Related to Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 27 (2016). It made the payments from "the same account from which the premium tax credit" advance payments were made—in other words, from the permanent appropriation described in 31 U.S.C. § 1324. Letter from Sylvia M. Burwell, Director of the Office of Mgmt. & Budget, to Ted Cruz and Michael S. Lee, U.S. Senators 4 (May 21, 2014), http://www.cruz.senate.gov/files/documents/Letters/20140521_Burwell_Response.pdf.

On November 21, 2014, the United States House of Representatives ("House") sued the Obama administration in the United States District Court for the District of Columbia ("D.C. district court") to stop the payment of cost-sharing reduction reimbursements to insurers. See generally U.S. House of Representatives v. Burwell, No. 1:14-cv-01967-RMC (D.D.C. filed Nov. 21, 2014). The D.C. district court ruled for the House, holding:

> The Affordable Care Act unambiguously appropriates money for Section 1401 premium tax credits but not for Section 1402 reimbursements to insurers. Such an appropriation cannot be inferred. None of Secretaries' extra-textual arguments—whether based on economics, "unintended" results, or legislative history—is persuasive. The Court will enter judgment in favor of the House of Representatives and enjoin the use of unappropriated monies to fund reimbursements due to insurers under Section 1402. The Court will stay its injunction, however, pending appeal by either or both parties.

U.S. House of Representatives v. Burwell, 185 F. Supp. 3d 165, 168 (D.D.C. 2016). The Obama administration appealed the ruling. See generally U.S. House of Representatives v. Azar ("Azar"), No. 16-5202 (D.C. Cir. filed July 6, 2016). However, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") stayed the appeal to allow President-elect Donald J. Trump and his future administration time to determine how to proceed. See Mot. Hold Briefing Abeyance 1-2, Azar, No. 16-5202 (Nov. 21, 2016); Order, Azar, No. 16-5202 (Nov. 21, 2016).

The Trump administration continued the previous administration's practice of making advance cost-sharing reduction payments to insurers. However, on October 11, 2017, the United States Attorney General sent a letter to the Treasury Secretary and the Acting Secretary of HHS advising that "the best interpretation of the law is that the permanent appropriation for 'refunding internal revenue collections,' 31 U.S.C. § 1324, cannot be used to fund the [cost-sharing reduction] payments to insurers authorized by 42 U.S.C. § 18071." Letter from Jefferson B. Sessions III, U.S. Attorney General, to Steven Mnuchin, Sec'y of the Treasury, and Don Wright, M.D., M.P.H., Acting Sec'y of HHS 1 (Oct. 11, 2017), http://www.hhs.gov/sites/default/files/csr-payment-memo.pdf. Based on this guidance, the Acting Secretary of HHS directed, the following day, that "[cost-sharing reduction] payments to issuers must stop, effective immediately," and that such "payments are prohibited unless and until a valid appropriation

exists." Memorandum from Eric Hargan, Acting Sec'y of HHS,[6] to Seema Verma, Administrator of the Ctrs. for Medicare & Medicaid Servs. (Oct. 12, 2017), http://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

### C. Reaction to the Termination of Cost-Sharing Reduction Payments

The Trump administration's termination of cost-sharing reduction payments did not come as a surprise to insurers:

> Anticipating that the Administration would terminate [cost-sharing reduction] payments, most states began working with the insurance companies to develop a plan for how to respond. Because the Affordable Care Act requires insurance companies to offer plans with cost-sharing reductions to customers, the federal government's failure to meet its [cost-sharing reduction] payment obligations meant the insurance companies would be losing that money. So most of the states set out to find ways for the insurance companies to increase premiums for 2018 (with open enrollment beginning in November 2017) in a fashion that would avoid harm to consumers. And the states came up with an idea: allow the insurers to make up the deficiency through premium increases for silver plans only. In other words, allow a relatively large premium increase for silver plans, but no increase for bronze, gold, or platinum plans.
>
> As a result, in these states, for everyone between 100% and 400% of the federal poverty level who wishes to purchase insurance on the exchanges, the available tax credits rise substantially. Not just for people who purchase the silver plans, but for people who purchase other plans too.

California, 267 F. Supp. 3d at 1134-35 (footnote omitted). In other words, by raising premiums for silver-level qualified health plans, the insurers would obtain more money from the premium tax credit program, which would help mitigate the loss of the cost-sharing reduction payments.[7]

---

[6] Eric Hargan was named Acting Secretary of HHS on October 10, 2017. See Press Release, The White House, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (Oct. 10, 2017), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-nominate-personnel-key-administration-posts-22/.

[7] Notably, increasing silver-level qualified health plan premiums would not harm most consumers who qualify for the premium tax credit because the credit increases as the premium increases. See California, 267 F. Supp. 3d at 1134 ("[T]he amount [of the premium tax credit] is based on the cost of the second-cheapest silver plan available on the exchange in your geographic area, and then adjusted based on your income (that is, based on where you fall on the spectrum between 100% and 400% of the federal poverty level). So, if premiums for the second-cheapest silver plan in your area go up, the amount of your tax credit will go up by a corresponding amount. See 26 U.S.C. § 36B."); see also id. at 1122 ("[M]ost state regulators

Accord id. at 1139 (agreeing with the states "that the widespread increase in silver plan premiums will qualify many people for higher tax credits, and that the increased federal expenditure for tax credits will be far more significant than the decreased federal expenditure for [cost-sharing reduction] payments"). This approach is commonly referred to as "silver loading," and many states appear to have endorsed it, see id. at 1137 ("Even before the Administration announced its decision, 38 states accounted for the possible termination of [cost-sharing reduction] payments in setting their 2018 premium rates. And now that the announcement has been made, even more states are adopting [the] strategy [of increasing silver-level plan premiums to obtain additional premium tax credit payments]." (footnote omitted)).

### D. Other Litigation

While the states and insurers were working on ways to mitigate the loss of cost-sharing reduction payments, the parties in the case on appeal at the D.C. Circuit began discussing that case's disposition. Joint Status Report 1-2, Azar, No. 16-5202 (Nov. 30, 2017). Ultimately, at the request of the parties, the D.C. Circuit dismissed the appeal, Order, Azar, No. 16-5202 (May 16, 2018), and the D.C. district court vacated the portion of its ruling in which it provided that "reimbursements paid to issuers of qualified health plans for the cost-sharing reductions mandated by Section 1402 of the Affordable Care Act, Pub. L. 111-148, are ENJOINED pending an appropriation for such payments," Order, Azar, No. 1:14-cv-01967-RMC (May 18, 2018).

A separate lawsuit was filed by seventeen states and the District of Columbia in the United States District Court for the Northern District of California ("California district court") to compel the Trump administration to continue making the advance cost-sharing reduction payments to insurers. See generally California v. Trump, No. 3:17-cv-05895-VC (N.D. Cal. filed Oct. 13, 2017). The California district court denied the states' motion for a preliminary injunction. California, 267 F. Supp. 3d at 1121-22, 1140. Eventually, the states requested a stay of the proceedings or, alternatively, dismissal of the suit without prejudice, explaining:

> [S]taying the proceedings is warranted to avoid disturbing the status quo given the general success of the practice commonly referred to as "silver-loading" which mostly curbed the harm caused by the federal government's unjustified cessation of cost-sharing reduction (CSR) subsidies mandated by Section 1402 of the Patient Protection and Affordable Care Act (ACA). At the same time, because of the real threat of the federal government taking action to prohibit silver-loading, the Court should retain jurisdiction, thus allowing the Plaintiff States to expeditiously seek appropriate remedies from this Court for the protection of their citizens. Alternatively, if the Court determines that a stay is not appropriate at this time, the Plaintiff States respectfully request that the Court dismiss the action without prejudice.

Mot. for Order Staying Proceedings or, in the Alternative, Dismissing Action Without Prejudice 2, California, No. 3:17-cv-05895-VC (July 16, 2018); cf. HHS Notice of Benefit and Payment

---

have devised responses that give millions of lower-income people better health coverage options than they would otherwise have had.").

Parameters for 2020, 84 Fed. Reg. at 283 ("The Administration supports a legislative solution that would appropriate CSR payments and end silver loading.  In the absence of Congressional action, we seek comment on ways in which HHS might address silver loading, for potential action in future rulemaking applicable not sooner than plan year 2021.").  The California district court dismissed the case without prejudice on July 18, 2018.  Order Dismissing Case Without Prejudice, California, No. 3:17-cv-05895-VC (July 18, 2018).

### E.  Effect of Cost-Sharing Reduction Payment Termination on Plaintiff

Plaintiff is a nonprofit corporation that offers qualified health plans on Wisconsin's exchange.[8]  It began offering qualified health plans on the exchange in January 2014, continued to offer such plans in 2015, 2016, 2017, and committed to offering such plans in 2018.  Plaintiff began receiving monthly advance cost-sharing reduction payments in January 2014 and, as with every other insurer offering qualified health plans on the exchanges, stopped receiving these payments effective October 12, 2017.  Plaintiff estimates that it is owed $12-13 million for 2017 and asserts that because approximately 65% of its insured population receives cost-sharing reductions, the unpaid amount will have a significant effect on its finances.  In addition, plaintiff estimates that it will be owed cost-sharing reduction payments of approximately $60 million for 2018.

### F.  Procedural History

Plaintiff filed a complaint in this court on June 27, 2017, to recover, for itself and other insurers, unpaid risk corridors payments for 2016.[9]  It then filed an amended complaint on November 22, 2017, to add a claim to recover, for itself and other insurers, the cost-sharing reduction payments that the government has not made for 2017 and 2018.[10]  In the latter claim,

---

[8]  Aside from the estimated amounts of unpaid cost-sharing reduction reimbursements, it appears that the facts in this subsection, which are derived from the allegations in plaintiff's amended complaint, are undisputed.

[9]  Proceedings on the risk corridors claim are currently stayed pending final, nonappealable judgments in Moda Health Plan, Inc. v. United States, No. 16-649C, and Land of Lincoln Mutual Health Insurance Co. v. United States, No. 16-744C.

[10]  A number of other insurers have filed suit in this court seeking to recover unpaid cost-sharing reduction reimbursements.  See, e.g., Local Initiative Health Auth. for L.A. Cty. v. United States, No. 17-1542C (Judge Wheeler); Me. Cmty. Health Options v. United States, No. 17-2057C (Chief Judge Sweeney); Cmty. Health Choice, Inc. v. United States, No. 18-5C (Chief Judge Sweeney); Sanford Health Plan v. United States, No. 18-136C (Judge Kaplan); Montana Health Co-op v. United States, No. 18-143C (Judge Kaplan); Molina Healthcare of Cal., Inc. v. United States, No. 18-333C (Judge Wheeler); Health Alliance Med. Plans, Inc. v. United States, No. 18-334C (Judge Campbell-Smith); Blue Cross & Blue Shield of Vt. v. United States, No. 18-373C (Judge Horn); Guidewell Mut. Holding Corp. v. United States, No. 18-1791C (Judge Griggsby); Harvard Pilgrim Health Care, Inc. v. United States, No. 18-1820C (Judge Smith).

plaintiff contends that the government violated the statutory and regulatory mandate to make cost-sharing reduction payments to insurers.

The court certified a cost-sharing reduction class on April 17, 2018. Thereafter, plaintiff moved for summary judgment on its cost-sharing reduction claim, and defendant cross-moved to dismiss that claim. The parties completed briefing, and after hearing argument on February 14, 2019, the court is prepared to rule.[11]

## II. STANDARDS OF REVIEW

### A. Motions for Summary Judgment

Plaintiff moves for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250. Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Statutory construction is a "question[] of law amenable to resolution through summary judgment." Stathis v. United States, 120 Fed. Cl. 552, 561 (2015); accord Anderson v. United States, 54 Fed. Cl. 620, 629 (2002) ("The plaintiff's entitlement . . . rests solely upon interpretation of the cited statute and is thus amenable to resolution by summary judgment."), aff'd, 70 F. App'x 572 (Fed. Cir. 2003) (unpublished opinion).

### B. Motions to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

Defendant cross-moves to dismiss plaintiff's cost-sharing reduction claim for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). To survive such a motion, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp., 550 U.S. at 556). Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

---

[11] The court has had the benefit of full briefing and oral argument in three cost-sharing reduction cases: Common Ground Healthcare Cooperative v. United States, No. 17-877C, Maine Community Health Options v. United States, No. 17-2057C, and Community Health Choice, Inc. v. United States, No. 18-5C. The plaintiffs in all three cases allege that the government violated the cost-sharing reduction statutes and regulations. Thus, in ruling on the parties' motions in this case, the court has considered the parties' arguments in all three cases.

## III. DISCUSSION

In seeking to recover the cost-sharing reduction payments not made by the government, plaintiff contends that the government's failure to make the payments was a violation of the cost-sharing reduction provisions of the Affordable Care Act and its implementing regulations. Plaintiff further contends that Congress's failure to specifically appropriate funds for cost-sharing reduction payments does not suspend or terminate the government's obligation to make the payments. Defendant disagrees, arguing that Congress expressed its intent that cost-sharing reduction payments should not be made absent a specific appropriation for that purpose by not appropriating funds for cost-sharing reductions in the Affordable Care Act or thereafter. Consequently, defendant contends, monetary damages—payable from the Judgment Fund—are unavailable from this court.

### A. The Government Is Obligated to Make Cost-Sharing Reduction Payments to Plaintiff Notwithstanding the Absence of a Specific Appropriation for That Purpose

To determine whether Congress intended the government to make cost-sharing reduction payments to insurers, the court first turns to the language of the Affordable Care Act. See Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text."); see also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). In addition to evaluating the specific provision of the Affordable Care Act establishing the cost-sharing reduction program, the court must read that provision in the context of the Affordable Care Act as a whole. See King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)); Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) ("When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . .'" (quoting Brown v. Duchesne, 60 U.S. 183, 194 (1856))); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Kilpatrick v. Principi, 327 F.3d 1375, 1384 (Fed. Cir. 2003) ("[I]n determining whether Congress has directly spoken to the point at issue, a court should attempt to discern congressional intent either from the plain language of the statute or, if necessary, by resort to the applicable tools of statutory construction[.]"). If congressional intent can be ascertained from evaluating the text of the Affordable Care Act, then the court's inquiry on this issue is complete. See Conn. Nat'l Bank, 503 U.S. at 254.

The statutory provision governing cost-sharing reductions sets forth an unambiguous mandate: "the Secretary [of HHS] shall make periodic and timely payments" to insurers "equal

to the value of the reductions" made by the insurers. 42 U.S.C. § 18071(c)(3)(A); accord Montana Health Co-op v. United States, 139 Fed. Cl. 213, 218 (2018)[12] ("[T]he statutory language clearly and unambiguously imposes an obligation on the Secretary of HHS to make payments to health insurers that have implemented cost-sharing reductions on their covered plans as required by the [Affordable Care Act]."); see also SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."); Gilda Indus., Inc. v. United States, 622 F.3d 1358, 1364 (Fed. Cir. 2010) ("When a statute directs that a certain consequence 'shall' follow from specified contingencies, the provision is mandatory and leaves no room for discretion."); cf. Moda Health Plan, Inc. v. United States, 892 F.3d 1311, 1320 (2018) (concluding that similar language in section 1342 of the Affordable Care Act—indicating that the Secretary of HHS "shall establish" a risk corridors program pursuant to which the Secretary of HHS "shall pay" risk corridors payments—is "unambiguously mandatory"). Moreover, the mandatory payment obligation fits logically within the statutory scheme established by Congress. The cost-sharing reduction payments were meant to reimburse insurers for paying an increased share of their insureds' cost-sharing obligations, 42 U.S.C. § 18071(a)(2), (c)(3)(A), and the reduction of insureds' cost-sharing obligations was meant to make obtaining health care more affordable, see, e.g., id. § 18071(c)(1)(A) (describing how cost-sharing reductions would be achieved by reducing insureds' out-of-pocket limits). In short, the plain language, structure, and purpose of the Affordable Care Act reflect the intent of Congress to require the Secretary of HHS to make cost-sharing reduction payments to insurers.

Defendant does not dispute this conclusion. Rather, it contends that the cost-sharing reduction payment obligation is unenforceable because Congress never specifically appropriated funds—either in the Affordable Care Act or thereafter—to make cost-sharing reduction payments.

**1. The Lack of Specific Appropriating Language in the Affordable Care Act**

As defendant observes, the Affordable Care Act does not include any language specifically appropriating funds for cost-sharing reduction payments. Defendant also correctly observes that the Act's cost-sharing reduction provision lacks any appropriating language, while its companion provision—the premium tax credit—included an explicit funding mechanism.[13] Compare Affordable Care Act § 1401(d) (amending the permanent appropriation set forth in 31 U.S.C. § 1324 to allow for the payment of the premium tax credit), with id. § 1402 (containing no appropriating language). According to defendant, the absence of any funding mechanism for cost-sharing reduction payments, and Congress's decision to provide a funding mechanism for premium tax credit payments and not cost-sharing reduction payments, reflect the intent of Congress, when enacting the Affordable Care Act, to preclude liability for cost-sharing reduction payments. Defendant is mistaken for several reasons.

---

[12] The judge who decided Montana Health Co-op—the Honorable Elaine D. Kaplan—subsequently issued a substantively identical ruling in another case. See Samford Health Plan v. United States, 139 Fed. Cl. 701 (2018).

[13] Both provisions appear in subpart A of part I of subtitle E of the Affordable Care Act, which is titled "Premium Tax Credits and Cost-Sharing Reductions." 124 Stat. at 213-24.

First, it is well settled that the government can create a liability without providing for the means to pay for it. See, e.g., Moda Health Plan, 892 F.3d at 1321 ("[I]t has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt, at least in certain circumstances."); Collins v. United States, 15 Ct. Cl. 22, 35 (1879) ("[T]he legal liabilities incurred by the United States under . . . the laws of Congress . . . may be created where there is no appropriation of money to meet them . . . ."). Thus, the absence of a specific appropriation for cost-sharing reduction payments in the Affordable Care Act does not, on its own, extinguish the government's obligation to make the payments.

Second, that Congress provided a funding mechanism for premium tax credit payments and not for cost-sharing reduction payments does not reflect congressional intent to foreclose liability for the latter. Defendant relies on the proposition that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)); accord Digital Realty Trust, Inc. v. Somers, 138 S. Ct. 767, 777 (2018). Here, although Congress may have acted intentionally by treating the two related provisions differently,[14] it is difficult to discern what that intent might be. In addition to the intent inferred by defendant, there are other reasonable explanations for the disparity. One possible explanation is that it was a simple matter to add the premium tax credit to a preexisting permanent appropriation in the Internal Revenue Code for the payment of tax credits, whereas no such permanent appropriation existed that would apply to cost-sharing reduction payments. Another possible explanation is that Congress understood that other funds available to HHS could be used to make the cost-sharing reduction payments; indeed, the cost-sharing reduction provision lacks any language, such as "subject to the availability of appropriations," reflecting Congress's recognition that appropriations were unavailable, see Greenlee Cty., Ariz. v. United States, 487 F.3d 871, 878 (Fed. Cir. 2007) (observing that "in some instances the statute creating the right to compensation . . . may restrict the government's liability . . . to the amount appropriated by Congress" with language such as "subject to the availability of appropriations"). A third possible explanation is that Congress intended to defer appropriating funds for cost-sharing reduction payments until 2014, when insurers began to offer qualified health plans on the exchanges and incur cost-sharing reduction liabilities. Because it is unclear which of these explanations—if any—is correct, the court declines to ascribe any particular intent to Congress based on Congress's disparate treatment of the two provisions.

Third, the court is unpersuaded by defendant's related contention that insurers' ability to increase premiums for their silver-level qualified health plans to obtain greater premium tax credit payments, and thus offset any losses from the government's nonpayment of cost-sharing reduction reimbursements, is evidence that Congress did not intend to provide a statutory

---

[14] Alternatively, it is possible that the disparate treatment does not reflect any intent at all. As the United States Supreme Court ("Supreme Court") recognized in King, "[t]he Affordable Care Act contains more than a few examples of inartful drafting." 135 S. Ct. at 2492. Thus, Congress's failure to include any appropriating language in the cost-sharing reduction provision may simply have been an oversight.

damages remedy for the government's failure to make the cost-sharing reduction payments. Accord Montana Health Co-op, 139 Fed. Cl. at 221. Defendant does not identify any statutory provision permitting the government to use premium tax credit payments to offset its cost-sharing reduction payment obligation (even if insurers intentionally increased premiums to obtain larger premium tax credit payments to make up for lost cost-sharing reduction payments). Nor does defendant identify any evidence in the Affordable Care Act's legislative history suggesting that Congress intended to limit its liability to make cost-sharing reduction payments by increasing its premium tax credit payments. That insurers and states discovered a way to mitigate the insurers' losses from the government's failure to make cost-sharing reduction payments does not mean that Congress intended this result. Moreover, defendant's concern that Congress could not have intended to allow a double recovery of cost-sharing reduction payments is not well taken. The increased amount of premium tax credit payments that insurers receive from increasing silver-level plan premiums are still premium tax credit payments, not cost-sharing reduction payments. Indeed, under the statutory scheme as it exists, even if the government were making the required cost-sharing reduction payments, insurers could (to the extent permitted by their state insurance regulators) increase their silver-level plan premiums; in such circumstances, it could not credibly be argued that the insurers were obtaining a double recovery of cost-sharing reduction payments. While the premium tax credit and cost-sharing reduction provisions were enacted to reduce an individual's health-care-related costs (to obtain insurance and to obtain health care, respectively), they are not substitutes for each other.[15]

Fourth, it would defy common sense to conclude that Congress obligated the Secretary of HHS to reimburse insurers for their mandatory cost-sharing reductions without intending to actually reimburse the insurers. If Congress did not intend to create such an obligation, it would not have included any provision for reimbursing cost-sharing reductions in the Act.

In sum, Congress's failure to include any appropriating language in the Affordable Care Act does not reflect congressional intent to preclude liability for cost-sharing reduction payments. This conclusion, however, does not end the court's analysis because defendant also argues that Congress's subsequent failure to appropriate funds to make cost-sharing reduction payments through annual appropriations acts or otherwise signals congressional intent to foreclose liability.

---

[15] The California district court's decision in California v. Trump does not assist defendant. Although the court described how insurers are coping with the lost cost-sharing reduction payments by raising silver-level qualified health plan premiums to obtain larger premium tax credit payments, nowhere in its decision does the court hold that the government's liability for cost-sharing reduction payments is lessened or eliminated by the government making larger premium tax credit payments to insurers. Indeed, the court very clearly emphasized that the premium tax credit program and the cost-sharing reduction program were separate and distinct. See California, 267 F. Supp. 3d at 1131. Moreover, the court's discussion of the approach taken by insurers to obtain increased premium tax credit payments was included within its analysis of "whether the absence of a preliminary injunction would harm the public and impede the objectives of health care reform." Id. at 1133. In other words, the court's focus was on how the increase in premiums would affect the public, and not on the government's obligation to make payments to insurers.

### 2. The Lack of Specific Appropriating Language in Subsequent Appropriations Acts

The Appropriations Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. The statute commonly referred to as the Antideficiency Act further provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]" 31 U.S.C. § 1341(a)(1)(A). These directives are unambiguous: disbursements from the United States Treasury require an appropriation from Congress. However, "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." N.Y. Airways, Inc. v. United States, 369 F.2d 743, 748 (Ct. Cl. 1966) (per curiam), cited in Moda Health Plan, 892 F.3d at 1321-22; cf. Moda Health Plan, 892 F.3d at 1322 (recognizing that the Supreme Court "rejected the notion that the Anti-Deficiency Act's requirements somehow defeat the obligations of the government").

Defendant does not contend that any appropriations acts—or, indeed, any statutes at all—enacted after the Affordable Care Act contain language that "expressly or by clear implication" modifies or repeals the Act's cost-sharing reduction payment obligation. Rather, it relies on Congress's complete failure to appropriate funds for cost-sharing reduction payments as evidence that Congress intended to suspend the cost-sharing reduction payment obligation. Defendant's reliance is misplaced. None of the appropriations acts enacted after the Affordable Care Act expressly or impliedly disavowed the payment obligation; they were completely silent on the issue. Thus, this case is distinguishable from those relied upon by defendant—Mitchell v. United States, 109 U.S. 146 (1883), Dickerson v. United States, 310 U.S. 554 (1940), and United States v. Will, 449 U.S. 200 (1980)—that concerned situations in which Congress made affirmative statements in appropriations acts that reflected an intent to suspend the underlying substantive law.

Here, Congress has had ample opportunity to modify, suspend, or eliminate the statutory obligation to make cost-sharing reduction payments but has not done so. Congress's inaction stands in stark contrast to its treatment of the Affordable Care Act's risk corridors program. Under that program, which was established in section 1342 of the Affordable Care Act, the Secretary of HHS was required to make annual payments to insurers pursuant to a statutory formula. 42 U.S.C. § 18062; Moda Health Plan, 892 F.3d at 1320. However, Congress included riders in two appropriations acts enacted after the Affordable Care Act that prohibited appropriated funds from being used to make risk corridors payments. See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, tit. II, § 225, 129 Stat. 2242, 2624; Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, tit. II, § 227, 128 Stat. 2130, 2491. These riders have been interpreted to suspend the government's obligation to make risk corridors payments from appropriated funds. Moda Health Plan, 892 F.3d at 1322-29. Congress has never enacted any such appropriations riders with respect to cost-sharing reductions payments, even when cost-sharing reduction payments were being made—during both the Obama and Trump administrations—from the permanent appropriation for tax

credits described in 31 U.S.C. § 1324. Thus, the congressional inaction in this case may be interpreted, contrary to defendant's contention, as a decision not to suspend or terminate the government's cost-sharing reduction payment obligation.[16]

In short, Congress's failure to appropriate funds to make cost-sharing reduction payments through annual appropriations acts or otherwise does not reflect a congressional intent to foreclose, either temporarily or permanently, the government's liability to make those payments.

### B. Plaintiff Can Recover Unpaid Cost-Sharing Reduction Reimbursements in the United States Court of Federal Claims

Plaintiff asserts that because the government has breached its statutory obligation to make cost-sharing reduction payments, recovery is available in the United States Court of Federal Claims ("Court of Federal Claims") under the Tucker Act. The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the United States Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012). It is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). It is well accepted that a statute "is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (panel portion) (quoting United States v. Mitchell, 463 U.S. 206, 219 (1983)). Under this rule, "[i]t is enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2003) (citation omitted).

The cost-sharing reduction provision of the Affordable Care Act, codified at 42 U.S.C. § 18071, is a money-mandating statute for Tucker Act purposes: the Secretary of HHS is required to reimburse insurers for their mandatory cost-sharing reductions, 42 U.S.C. § 18071(c)(3)(A), and his failure to make such payments is a violation of that duty that deprives the insurers of money to which they are statutorily entitled. Accord Montana Health Co-op, 139 Fed. Cl. at 217; see also Moda Health Plan, 892 F.3d at 1320 n.2 (holding that the statute providing for risk corridors payments "is money-mandating for jurisdictional purposes").

---

[16] The court recognizes that drawing inferences from congressional inaction can be highly problematic. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) ("Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction . . . ." (quoting United States v. Wise, 370 U.S. 405, 411 (1962)); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act.").

Consequently, an insurer that establishes that the government failed to make the cost-sharing reduction payments to which the insurer was entitled can recover the amount due in this court.[17]

Moreover, the lack of a specific appropriation for cost-sharing reduction payments does not preclude such a recovery.  Appropriations merely constrain government officials' ability to obligate or disburse funds.  See Moda Health Plan, 892 F.3d at 1322 ("The Anti-Deficiency Act simply constrains government officials. . . .  Budget authority is not necessary to create an obligation of the government; it is a means by which an officer is afforded that authority."); Ferris v. United States, 27 Ct. Cl. 542, 546 (1892) ("An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.").  Thus, the lack of an appropriation, standing alone, does not constrain the court's ability to entertain a claim that the government has not discharged the underlying statutory obligation or to enter judgment for the plaintiff on that claim.  See Slattery v. United States, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (en banc) ("[T]he jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid."); N.Y. Airways, 369 F.2d at 752 ("[T]he failure of Congress or an agency to appropriate or make available sufficient funds does not repudiate the obligation; it merely bars the accounting agents of the Government from disbursing funds and forces the carrier to a recovery in the Court of Claims."); Collins, 15 Ct. Cl. at 35 (remarking that a legal liability "incurred by the United States under . . . the laws of Congress," such as "[t]he compensation to which public officers are legally entitled . . . , exists independently of the appropriation, and may be enforced by proceedings in this court").

---

[17] Defendant appears to contend that for plaintiffs to recover under a money-mandating statute, they must separately establish that the statute authorizes a damages remedy for its violation.  Defendant is incorrect.  Although some money-mandating statutes include a separate provision authorizing a damages remedy, see, e.g., 41 U.S.C. § 7104(b) (2012) (allowing contractors to bring claims arising under the Contract Disputes Act of 1978 in the Court of Federal Claims), other money-mandating statutes pursuant to which the Court of Federal Claims can enter judgment do not, see, e.g., 5 U.S.C. § 5942 (2012) (governing federal employees' entitlement to a remote duty allowance); 37 U.S.C. § 204 (2012) (governing military service members' entitlement to basic pay).  Indeed, "[t]o the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty."  White Mountain Apache Tribe, 537 U.S. at 477; accord Fisher, 402 F.3d at 1173 (en banc portion) ("[T]he determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action."); Montana Health Co-op, 139 Fed. Cl. at 217 n.5 ("Plaintiffs have never been required to make some separate showing that the money-mandating statute that establishes this court's jurisdiction over their monetary claims also grants them an express (or implied) cause of action for damages.").

In fact, judgments of this court are payable from the Judgment Fund, see 31 U.S.C. § 1304(a)(3)(A), which "is a permanent, indefinite appropriation . . . available to pay many judicially and administratively ordered monetary awards against the United States," 31 C.F.R. § 256.1 (2016); accord Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1583 (Fed. Cir. 1994) (stating that 31 U.S.C. § 1304 "was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment"). Indeed, as applicable here, "funds may be paid out [of the Judgment Fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 432 (1990); accord Moda Health Plan, 892 F.3d at 1326 ("[A]ccess to the Judgment Fund presupposes liability."); cf. 31 U.S.C. § 1304(a)(1) (indicating that the Judgment Fund is available when "payment is not otherwise provided for"). Because plaintiff's claim arises from a statute mandating the payment of money damages in the event of its violation, the Judgment Fund is available to pay a judgment entered by the court on that claim.[18]

### C. Plaintiff Is Entitled to Recover Unpaid Cost-Sharing Reduction Reimbursements

Plaintiff seeks to recover the cost-sharing reduction payments that it has not received for 2017 and 2018. As noted above, plaintiff has established that the government is obligated to reimburse it for its cost-sharing reductions pursuant to 42 U.S.C. § 18071(c)(3)(A) and that the

---

[18] Defendant acknowledged this possibility in other litigation. See Defs.' Mem. Supp. Mot. Summ. J. 20, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("The [Affordable Care] Act requires the government to pay cost-sharing reductions to issuers. The absence of an appropriation would not prevent the insurers from seeking to enforce that statutory right through litigation. Under the Tucker Act, a plaintiff may bring suit against the United States in the Court of Federal Claims to obtain monetary payments based on statutes that impose certain types of payment obligations on the government. If the plaintiff is successful, it can receive the amount to which it is entitled from the permanent appropriation Congress has made in the Judgment Fund. The mere absence of a more specific appropriation is not necessarily a defense to recovery from that Fund." (citations omitted)); Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. 12-13, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("Indeed, had Congress not permanently funded the cost-sharing reductions, it would have exposed the government to litigation by insurers, who could bring damages actions under the Tucker Act premised on the government's failure to make the mandatory cost-sharing reduction payments that the Act requires."); Defs.' Reply Mem. Supp. Mot. Summ. J. 9, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("[T]he House's interpretation of the [Affordable Care Act]—under which the Act would require the government to make the cost-sharing payments but provide no appropriation for doing so directly—would invite potentially costly lawsuits under the Tucker Act. The House asserts that insurers could not prevail in such suits '[a]bsent a valid appropriation.' But courts have held that the absence of an appropriation does not necessarily preclude recovery from the Judgment Fund in a Tucker Act suit. The House does not explain how, given this precedent, the government could avoid Tucker Act litigation by insurers in the wake of a ruling that the ACA did not permanently fund the cost-sharing reduction payments that the Act directs the government to make." (citations omitted)).

government stopped making such reimbursements in October 2017. Accordingly, at a minimum, it is entitled to recover the cost-sharing reduction payments that the government did not make for 2017.

With respect to 2018, defendant contends—as discussed above, albeit in the course of arguing that the structure of the Affordable Care Act reflects a congressional intent to preclude cost-sharing reduction payments absent an appropriation for that purpose—that plaintiff's ability to increase the premiums for its silver-level qualified health plans to obtain greater premium tax credit payments precludes recovery under the Act's cost-sharing reduction provision. Specifically, defendant asserts that the statutory scheme enacted by Congress permits insurers to make up any lost cost-sharing reduction payments by increasing silver-level plan premiums, which would prevent monetary injury to insurers. Defendant also expresses concern that allowing insurers to both obtain greater premium tax credits and obtain a judgment for their lost cost-sharing reduction payments would provide an unwarranted windfall for insurers. As noted above, the court is not convinced by defendant's arguments. Accordingly, it finds that plaintiff may recover the cost-sharing reduction payments that the government did not make for 2018.

## IV.  CONCLUSION

For the reasons set forth above, the court concludes that the government's failure to make cost-sharing reduction payments to plaintiff violates 42 U.S.C. § 18071. Therefore, it **GRANTS** plaintiff's motion for summary judgment and **DENIES** defendant's motion to dismiss. By **no later than Thursday, February 28, 2019**, the parties shall file a joint status report indicating the amount due to plaintiff and the other class members for the cost-sharing payments they did not receive for 2017 and 2018. For each class member, the parties shall indicate (1) the amount due for 2017, (2) the amount due for 2018, and (3) the sum of the amounts due for 2017 and 2018. If the parties are unable to provide the amounts due for 2018, they shall (1) suggest a deadline for providing the court with that information and (2) indicate whether an RCFC 54(b) judgment limited to the cost-sharing reduction claims for 2017 would be appropriate. If the parties are able to provide the amounts due for 2018, the court will direct the entry of judgment on the class's cost-sharing reduction claims for 2017 and 2018 pursuant to RCFC 54(b).

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge